IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DEBORAH B.,[1] | ) |
| | ) |
|       **Plaintiff,** | ) |
| | ) |
| vs. | ) Case No. 20-cv-725-SMY |
| | ) |
| ANDREW SAUL, | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
|       **Defendant.** | ) |

# MEMORANDUM AND ORDER

**YANDLE, District Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Deborah B. seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits ("DIB") pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB in December 2017, alleging a disability onset date of October 2017. An Administrative Law Judge ("ALJ") denied the application on October 9, 2019 following an evidentiary hearing (Tr. 10-30). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final agency decision subject to judicial review (Tr. 1). Plaintiff exhausted administrative remedies and filed a timely Complaint with this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ failed to meet its burden at Step 5 of the sequential evaluation.

2. The ALJ failed to properly evaluate residual functional capacity ("RFC").

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed.R.Civ.P. 5.2(c) and the Advisory Committee Notes.

**Legal Standard**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

In determining whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his or her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520. An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...." 42 U.S.C. § 405(g). Thus, the Court is not tasked with determining whether Plaintiff was disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for substantial evidence, the Court considers the entire administrative record, but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own

judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). At the same time, judicial review is not abject; the Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

### Decision of the ALJ

Plaintiff was insured for DIB through September 30, 2022. The ALJ followed the five-step analytical framework with respect to Plaintiff's application. She determined that Plaintiff had not worked at the level of substantial gainful activity since the alleged onset date and found that Plaintiff suffered from the following severe impairments since the alleged onset date of disability: sarcoid arthropathy; sarcoidosis; erythema nodosum; and pulmonary nodules. However, she found that Plaintiff's major depressive disorder ("MDD"), generalized anxiety disorder ("GAD"), and alleged vision issues were mild and did not cause more than minimal vocationally relevant limitations and were, therefore, not severe.

> The ALJ determined that Plaintiff had the RFC to do the following:
>
> can never climb ladders, ropes, or scaffolds; must never be exposed to unprotected heights or hazardous work environments; can no more than occasionally climb ramps or stairs; can no more than occasionally stoop, kneel, crouch, or crawl; limited to remembering and carrying out simple, routine tasks and making simple, work-related decisions, cannot perform production pace tasks that require strict hourly goals; must avoid concentrated exposure to dust, fumes, or other pulmonary irritants; must avoid concentrated exposure to extreme heat, extreme cold, or to humidity; and will be off task five percent of the workday.

The ALJ ultimately concluded that Plaintiff was not disabled because she was able to do other jobs that exist in significant numbers in the national economy, based on the testimony of a vocational expert ("VE").

### The Evidentiary Record

The Court reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

1. **Agency Forms**

Plaintiff was born in 1967 and was 50 years old on the alleged onset date of October 11, 2017 (Tr. 157). In her application for disability benefits, Plaintiff listed the following conditions as limiting her ability to work: autoimmune disorder, sarcoidosis, anxiety, depression, arthritis, and nodules in lungs (Tr. 60).

2. **Evidentiary Hearing**

Plaintiff was represented by counsel at her hearing on September 19, 2019 (Tr. 33) and testified to the following: She was last employed as a certified nurse aide ("CNA") at Jerseyville Manor in October 2017. Plaintiff's position as a CNA required her to assist patients with various day-to-day activities such as bathing, toileting, and dressing. Her position required her to occasionally bear the weight of patients as she assisted them with their personal care needs (Tr. 41-42). She quit her job because of chronic pain and weakness. *Id.* She has a driver's license and only drives to the grocery store (Tr. 44-45). She can do some household chores such as prepare meals, fold laundry and wash dishes, but requires breaks to complete such tasks because she becomes short of breath (Tr. 47-49). She is only able to stand for ten to fifteen minutes before she starts feeling pain (Tr. 47). Her insurance does not cover all her treatments or diagnostic observation imaging (Tr. 51).

A vocational expert ("VE") testified during the hearing (Tr. 53). The ALJ posed hypothetical questions to the expert that corresponded to the ultimate RFC findings. (Tr. 54-55). The VE testified that there is work in the national economy for an individual with Plaintiff's conditions (Tr. 55). This work was categorized as light and unskilled. *Id*.

3. **Relevant Medical Records**

Plaintiff has a history of sarcoidosis and erythema nodosum which are generally treated with medication. From 2010 through 2018, Plaintiff received medical care from her primary care physician Dr. Sonya Schleeper. In December 2016, Plaintiff saw Dr. Schleeper for a follow-up visit to discuss her medications (Tr. 334). Plaintiff requested an increase in her prednisone because she was beginning

to have nodules on her legs again. *Id*. She reported that the nodules are painful, swollen, and red. *Id*. Plaintiff also reported that her sarcoidosis was worsened by cold weather. *Id*.

Plaintiff presented to Dr. Schleeper in March 2017 with complaints of a cold and flare up (Tr. 326). She was diagnosed with unspecified acute bronchitis and prescribed medication (Tr. 329). Dr. Schleeper prescribed 20 mg of prednisone for erythema nodosum. *Id*.

Plaintiff's next noted flare up in her legs occurred in August 2017 (Tr. 315). She reported that the leg nodules had returned and started as a small lesion which increased following work as a CNA; that she experienced flares with illnesses and colds; that she had mild cold symptoms the week before the flare up; and that she experienced a lot of stress due to her sister's recent death, but kept busy with work and grandkids. *Id*. Dr. Schleeper prescribed Plaintiff medication for sarcoidosis, depression, erythema nodosum, and unspecified pain in her leg (Tr. 319).

Plaintiff presented to Dr. Schleeper in October 2017 for complaints of a red rash on her legs and arm (Tr. 306). Dr. Schleeper noted that Plaintiff was diagnosed with erythema nodosum several years ago and that she had intermittent flare ups every few months. *Id.* The nodules caused severe pain and no modifying factors were noted. *Id.* The records indicated that Plaintiff quit her job because she was too upset at work and had various stressors. *Id.* Dr. Schleeper prescribed a higher dose of prednisone for erythema nodosum and hydrocodone-acetaminophen for the unspecified pain in her leg (Tr. 310).

During a follow-up visit in November 2017, Plaintiff again complained of the return of the redness in her legs after finishing a high dose of prednisone (Tr. 302). The records note that Plaintiff was not seeing a rheumatologist but had seen Dr. Ying Du in the past. *Id*. The records also note that Plaintiff had been stressed due to the death of her sister in June 2017. *Id*. Plaintiff reported worrying about many things to the point she had to quit her job as a CNA. *Id*. She was referred to a rheumatologist for erythema nodosum and prescribed hydrocodone-acetaminophen for her unspecified leg pain and Venolin for sarcoidosis (Tr. 305).

Plaintiff presented to Dr. Du on December 12, 2017 for inflammatory arthritis and erythema nodosum (Tr. 283). Prior to that, she was last seen by him in May 2015. *Id*. Dr. Du noted that Plaintiff takes prednisone on and off and had chest CTs in 2013 and 2014 that showed pulmonary nodules. *Id*. Although sarcoidosis was suspected, Plaintiff never had a biopsy. *Id*. Dr. Du noted that Plaintiff stopped working in October 2017 as a CNA and that she had pain in her arms and legs and painful nodules on legs. *Id*. A CT scan in December 2017 showed nodules in the lung (Tr. 293). The subpleural left lower lobe nodule measured 7 mm – an increase of 1 mm from her last CT in 2014. *Id*. A follow-up CT was recommended in 6-12 months to assess the stability of the nodules. *Id*. at 294. The records do not indicate if the follow-up CT was performed. *Id*.

Plaintiff presented to pulmonologist Dr. Nadeem Ahmed in February 2018 (Tr. 421). He noted that her lung nodules could be due to sarcoid or could be inflammatory and that they remain small in size (Tr. 423). He also noted that Plaintiff never had a biopsy done to prove she has sarcoidosis. *Id*. Dr. Ahmed requested a follow-up visit in six months. *Id*.

Plaintiff saw Dr. Jeffrey Horvath, a rheumatologist, in July 2018 for a new patient visit (Tr. 394). Dr. Horvath noted her "questionable past history of sarcoidosis". *Id*. Plaintiff had no lesions during the visit but reported that they come and go. *Id*. Dr. Horvath noted that Plaintiff's CT scans performed during Spring 2018 showed stable nodules. *Id*.

Plaintiff saw Dr. Schleeper in June 2019 for a 3-month check-up (Tr. 453). She complained about knots on her legs. *Id*. Dr. Schleeper noted that Plaintiff "does not follow-up with Dr. Horvath because he does not do much." *Id*. The medical records indicate that Dr. Ahmed wanted a CT of Plaintiff's chest, but Plaintiff was unsure if this had been performed. *Id*.

Plaintiff was seen by Kristen Kilpatrick, FNP-C in June 2019 for complaints of nodules on the inside of her left cheek and recurrent red bumps on her right leg (Tr. 457). Kilpatrick noted that Plaintiff had recurring skin lesions that usually responded to steroids and antibiotics and was prescribed medication in June 2019 by Dr. Schleeper, which did not improve her condition. Plaintiff reported that

the mouth nodule was not painful, but annoying. *Id.* She reported that the red spots on her leg were painful but not itchy. *Id*.

### 4. State Agency Consultants' Opinions

The record does not include an opinion from a treating physician but does include two state agency consultant opinions.

On April 19, 2018, Max Hammer, M.D., reviewed the evidence and opined that Plaintiff could perform light exertional work, including standing with breaks for 6 hours per day and sitting for 6 hours per day (Tr. 66).

Victoria Dow, M.D. reviewed Plaintiff's file and concluded that Plaintiff was not disabled (Tr. 81). Dr. Dow concluded that none of Plaintiff's conditions were severe impairments to her ability to work, including sarcoidosis, arthritis, anxiety, and depression (Tr. 80).

## Discussion

Plaintiff asserts that the ALJ erred in relying on the vocational expert opinion and in assessing her RFC. The Court discusses each argument in turn.

### *Vocational Expert Opinion*

The ALJ must consider an assessment of the claimant's RFC at the fourth and fifth steps of the applicable analysis. The assessment includes a determination of what work-related activities the claimant can perform despite her limitations. *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); 20 C.F.R. § 404.1545(a)(1). The RFC must be assessed based on all the relevant evidence in the record. 20 C.F.R. § 404.1545(a)(1); *Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004). A vocational expert's ("VE") testimony can satisfy the assessment requirements only if that testimony is reliable. *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008).

Plaintiff contends the ALJ failed to resolve a conflict in the VE's testimony, and therefore, the ALJ could not have relied on the VE's findings. The ALJ's RFC assessment limited Plaintiff to remembering and carrying out simple, routine tasks and making simple, work-related decisions. At

the same time, the VE opined that Plaintiff would be able to carry out the duties of an electrical assembler, routing clerk, and merchandise clerk. Under the Dictionary of Occupational Titles ("DOT"), these positions involve a reasoning of level two, indicating that the person must "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions…[d]eal with problems involving a few concrete variables in or from standardized situations." Plaintiff argues that Reasoning Level 2 is incongruous with the ALJ's determination that she can only follow "simple" tasks and work-related decisions.

Social Security Ruling ("SSR") 00–4p imposes a two-fold responsibility on the ALJ if she intends to rely on testimony from a VE about the requirements of a particular job. First, the ALJ must specifically ask the VE about any possible conflicts between the VE's testimony and the DOT. Second, if there is an apparent conflict, the ALJ must obtain a reasonable explanation from the VE for that conflict. SSR 00-4p; *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008). For a conflict to be "apparent" it must be so obvious that the ALJ should have recognized it without any assistance. *Sawyer v. Colvin*, 512 F. App'x 603, 610 (7th Cir. 2013).

Here, the ALJ satisfied the first step by asking the VE if his testimony was consistent with the DOT. The VE answered yes, albeit erroneously. As to the second step, the Court finds that the assigned Reasoning Levels of the listed jobs do not inherently conflict with the ALJ's RFC assessment. Courts in this Circuit have found that a limitation to simple, routine tasks is not inconsistent with level two or three reasoning. *See Terry v. Astrue*, 580 F.3d 471, 480 (7th Cir. 2009) (a capacity to follow simple instructions was not inconsistent with Reasoning Level 3); *Sawyer*, 512 F. App'x at 610–11(finding no conflict between a "simple tasks" restriction and Reasoning Level 3 and noting that "even workers who are markedly limited in their ability to understand, remember, and follow detailed instructions might still be able to perform jobs requiring level 3 reasoning development"); *Stile v. Colvin*, 2017 WL 2908783, at *7-8 (N.D. Ill. 2017) (following simple instructions and making simple decisions is not inconsistent with Reasoning Level 2).

The ALJ may rely on imperfect VE testimony if a claimant does not question the basis for the testimony at the time of the hearing. *See Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004). Plaintiff's counsel never challenged the VE's testimony nor questioned its foundation during the hearing. Cross examination of the VE was limited to asking the expert how he obtained the estimates of the number of each job that existed in the national economy (Tr. 56).

In light of the above-referenced case authority and given Plaintiff's failure to cite any persuasive legal authority in support of her position to the contrary, this Court concludes that the reasoning levels of the identified jobs alone do not render them inconsistent with the RFC's simple work-related restrictions.

### The ALJ's RFC Determination

At step four, the ALJ determined that Plaintiff, despite her limitations, had the following RFC:

> can never climb ladders, ropes, or scaffolds; must never be exposed to unprotected heights or hazardous work environments; can no more than occasionally climb ramps or stairs; can no more than occasionally stoop, kneel, crouch, or crawl; limited to remembering and carrying out simple, routine tasks and making simple, work-related decisions, cannot perform production pace tasks that require strict hourly goals; must avoid concentrated exposure to dust, fumes, or other pulmonary irritants; must avoid concentrated exposure to extreme heat, extreme cold, or to humidity; and will be off task five percent of the workday.

Plaintiff argues that the ALJ improperly evaluated her RFC because the evidence supports a finding that she is limited to sedentary work rather than light work. Plaintiff asserts that the ALJ failed to mention the medical records supporting her testimony that the painful lesions and nodules on her arms and legs limit her ability to stand for longer than 10 minutes at a time, failed to recognize that her treatment escalated following her disability onset date, and failed to consider that she had good cause for not obtaining more treatment.

The RFC is a measure of what an individual can do despite the limitations imposed by her impairments. 20 C.F.R. § 404.1545(a). It is "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities," *Id.*, and must be supported

by substantial evidence. *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000). "As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). An "ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). However, "an ALJ need not mention every piece of evidence, so long as [she] builds a logical bridge from the evidence to [her] conclusion." *Id.* (citing *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)).

In this case, the ALJ supported her RFC determination with substantial evidence and accurately characterized the medical evidence. She noted that Plaintiff's treatment notes from her primary provider, rheumatologist, and pulmonologist generally document that Plaintiff has nodules that were treated with Prednisone and other medications but do not support a frequency or escalating treatment consistent with Plaintiff's testimony. The ALJ also noted that Plaintiff's medical records reflect that she intermittently had nodules or lesions on her legs. While Plaintiff maintains that the ALJ did not reasonably address her alleged escalating treatment, she offers no evidence of escalating treatment – she merely points out that a provider observed lesions in October 2017.

The ALJ engaged in a detailed discussion of the medical record and was entitled to rely on the objective medical evidence; evidence that did not support Plaintiff's testimony of chronic debilitating pain. The ALJ may rely on conflicts between Plaintiff's testimony and the objective record, as "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch,* 539 F.3d at 483. The ALJ did not dispute that Plaintiff has physical impairments which cause some difficulties but questioned Plaintiff's testimony regarding the severity of the pain. The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to

discount the applicant's testimony on the basis of the other evidence in the case." *Johnson v. Barnhart,* 449 F.3d 804, 805 (7th Cir.2006).

The ALJ provided reasons beyond the objective medical evidence for doubting the accuracy of Plaintiff's testimony. Although Plaintiff testified that she quit her job in 2017 because of chronic pain, she reported to treatment providers in 2017 and 2018 that a family death, family issues, and the need to care for her ailing sister were the actual motivation for leaving her job. The ALJ also discussed some of Plaintiff's daily activities that she felt were incongruous with the severity of symptoms alleged. For example, despite her limitations, Plaintiff reported that she had no problems with personal care, could prepare simple meals, drive, shop and do some household chores.

Plaintiff also argues that the ALJ erred by not considering her lack of insurance as good cause for her failure to obtain more medical care. The ALJ specifically reasoned that Plaintiff's purported lack of insurance was not persuasive enough evidence to support her complaints in light of her overall conservative treatment and presentation to providers. An ALJ's subjective-symptom evaluation is not automatically reversibly flawed, even if she ignores a claimant's assertion of lack of insurance. *See Kittelson v. Astrue,* 362 Fed.Appx. 553, 558 (7th Cir. 2010) (finding harmless error despite the fact that the ALJ drew a negative inference from a claimant's failure to seek additional medical treatment without first considering explanations for the failure); *Hosea M. v. Saul*, 2019 WL 5682835, at *10 (N.D. Ill. Nov. 1, 2019), *aff'd sub nom. Matthews v. Saul*, 833 F. App'x 432 (7th Cir. 2020) (same).

Other evidence in the record also supports the ALJ's RFC determination. The only medical opinions were provided by state-agency medical experts Dr. Max Hammer and Dr. Victoria Dow. The ALJ credited Dr. Hammer's opinion that Plaintiff could do light work with postural limitations despite sarcoidosis and inflammatory arthritis. This opinion was more favorable than the opinions of Dr. Dow, who opined that Plaintiff had no significant work-related physical dysfunction. None of Plaintiff's treatment providers offered any opinions – let alone an opinion that Plaintiff was more limited than the

ALJ found.  Nor were any notations or limitations documented in the medical records that would support such a conclusion.

Ultimately, the ALJ was required to explain her subjective symptom evaluation "in such a way that allows [the Court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record."  *Murphy*, 759 F.3d at 816 (internal quotations omitted).  She did so, and her credibility determinations are due special deference as factual findings.  *Matthews v. Saul,* 833 F. App'x 432, 438 (7th Cir. 2020). Plaintiff offers no meaningful reason the ALJ's credibility determination should not be upheld, nor does this Court believe the ALJ was patently wrong in her assessment in this case.

## Conclusion

After careful review of the record, the Court finds that ALJ committed no errors of law, and that her findings are supported by substantial evidence.  Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED.**  The Clerk of Court shall enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

**DATED:  March 21, 2022**

**STACI M. YANDLE**
**United States District Judge**